1    WO

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9    Loretta H. Cheeks,                           No. CV-12-01543-PHX-JAT

10                    Plaintiff,                   **ORDER**

11   v.

12   General Dynamics, et al.,

13                    Defendants.

14

15          Pending before the Court is Plaintiff Loretta H. Cheeks Motion for Partial

16   Summary Judgment (Doc. 85) on Defendants General Dynamics Corporation ("GD") and

17   General Dynamics C4 Systems Incorporated's ("GDC4S") affirmative statute of

18   limitations and failure to mitigate damages defenses and GDC4S's counterclaim for

19   breach of contract. Also pending is Defendants' Motion for Summary Judgment

20   (Doc. 93) on all of Plaintiff's claims and on GDC4S's counterclaim. Both motions are

21   fully briefed (Docs. 90, 94, 95, 102) and the Court heard oral argument on May 15, 2014.

22   The Court now rules on both motions.

23   I.     **BACKGROUND**[1]

24          Defendant GD is the parent company of Defendant GDC4S. (Defendants'

25   Statement of Facts in Support of Motion for Summary Judgment ("DSOF"), Doc. 88 ¶ 1;

26   _____

27          [1] This section contains general background information to provide context for the
     Court's analysis, not factual findings of the Court. The Court construes all disputed facts
28   in the light most favorable to the non-movant. *Ellison v. Robertson*, 357 F.3d 1072, 1075
     (9th Cir. 2004).

Plaintiff's Statement of Facts in Response to Motion for Summary Judgment ("PRSOF"), Doc. 96 ¶ 1). Plaintiff (a female African-American with a son disabled by autism) began her employment with GDC4S in September 2001 after GDC4S acquired the division of Motorola where Plaintiff worked. (DSOF ¶ 19; PRSOF ¶ 19). As a condition of employment, Plaintiff signed an Employee Confidentiality Agreement in which she agreed not to remove or possess GDC4S property or documents without prior written consent. (DSOF ¶ 20; PRSOF ¶ 20).

Plaintiff was one of thousands of engineers employed by GDC4S whose career paths generally lead to development of either specialized technical or management skills. (DSOF ¶¶ 4–7; PRSOF ¶¶ 4–7). GDC4S divides its engineers into "sections" managed by a "Section Manager" who helps the engineers find (often temporary) assignments on various customer-funded programs, business development projects, or internal research and development projects. (DSOF ¶¶ 8–10; PRSOF ¶¶ 8–10). The Section Managers often work directly with "Program Managers" in an informal process to help place engineers in specific projects. (DSOF ¶¶ 10–14; PRSOF ¶¶ 10–14). When engineers are not assigned to a specific project, they charge their work time as department "overhead." (DSOF ¶ 12; PRSOF ¶ 12). An engineer's grade level, title, salary and benefits do not change regardless of whether the engineer is assigned to a project or charging overhead because GDC4S anticipated it will be able to find future assignments for its engineers. (DSOF ¶ 13; PRSOF ¶ 13). If an engineer seeks a promotion or transfer to a different position involving a title, pay, department, or grade change, then the engineer must formally apply for an open position through GDC4S's Internal Opportunity System ("IOS"). (DSOF ¶ 15; PRSOF ¶ 15).

During her employment, Plaintiff variously worked on customer-funded projects and internal "overhead." Plaintiff's early customer-funded project assignments tended to be focused on management duties rather than technical aspects of the project. (DSOF ¶¶ 32–36, 41; PRSOF ¶¶ 32–36, 41). In 2004, Plaintiff was removed from a position as project lead on the "Rescue 21" project because of perceived performance issues. (DSOF

¶ 63; PRSOF ¶ 63). After being removed, Plaintiff filed an internal complaint through GDC4S's Dispute Resolution Program ("DRP") (DSOF ¶ 69; PRSOF ¶ 69). Although Plaintiff now alleges that the 2004 DRP complaint was also motivated by racial, sexist, and anti-disability bias, she admits that her primary purpose in filing the complaint was to find a position on a customer-funded program. (DSOF ¶¶ 71–75; PRSOF ¶¶ 71–75). Sometime during the pendency of the 2004 DRP complaint investigation, Plaintiff was placed on a "Mobile User Objective System" ("MUOS") project, which, at the time, Plaintiff agreed resolved her complaint. (DSOF ¶¶ 68, 74, 77; PRSOF ¶¶ 68, 74, 77). Between 2005 and 2009, Plaintiff worked variously on business development and other projects, described her experience as "outstanding," and, at multiple times, worked on overhead without any resulting adverse employment actions or other negative impacts. (DSOF ¶¶ 78–83; PRSOF ¶¶ 78–83).

Beginning in 2009, drastic government spending cuts (GDC4S's develops technology primarily for government customers) dramatically decreased opportunities for GDC4S engineers. (DSOF ¶¶ 84–91; PRSOF ¶¶ 84–91). In May 2010, Terry O'Dea ("O'Dea") became Plaintiff's section manager and began working to place Plaintiff and other engineers who had no assignment onto available programs. (DSOF ¶¶ 93–99; PRSOF ¶¶ 93–99). The various program managers offered neither Plaintiff nor many of O'Dea's other engineers (most of whom where Caucasian males) assignments on their projects. (DSOF ¶¶ 106, 111–13; PRSOF ¶¶ 106, 111–13).

Only one program at GDC4S provided a significant number of assignment opportunities (eventually, 72 assignments) in 2010 and 2011: the new Space Network Ground Segment Sustainment ("SGSS") satellite program for NASA which started staffing in the fall of 2010. (DSOF ¶¶ 101, 179; PRSOF ¶¶ 101, 179). The SGSS program managers, Bill Worger ("Worger") and Vince Pipitone ("Pipitone"), sought engineers with substantial relevant technical experience and informally made assignment decisions based largely on their personal knowledge of each individual's relevant work experience. (DSOF ¶¶ 180–84; PRSOF ¶¶ 180–84). O'Dea (and other section managers) informally

1   sent lists of available engineers, but most, including Plaintiff, were not specifically
2   considered for SGSS assignments. (*Id.*). Thus, throughout the vast majority of 2010,
3   Plaintiff, as well as many other engineers, had no assignment and charged overhead.

4       In January 2011, O'Dea expressed growing concern with engineers charging
5   overhead and Plaintiff requested a meeting with O'Dea and HR representatives to express
6   her concerns about finding assignments. (DSOF ¶¶ 185, 187; PRSOF ¶¶ 185, 187). Prior
7   to meeting, Plaintiff emailed O'Dea: "Thanks for the help. No need at this point. I trust
8   you've done your best," which Plaintiff honestly believed. (DSOF ¶¶ 188–89; PRSOF
9   ¶¶ 188–89). Shortly thereafter, O'Dea completed the 2011 performance review process of
10  his engineers' 2010 performance. (DSOF ¶ 191; PRSOF ¶ 191). During the process,
11  O'Dea gave a "Needs Improvement" rating to all ten engineers, including Plaintiff, who
12  did not have sufficient customer-funded assignments in 2010 from which performance
13  could be evaluated.[2] (DSOF ¶¶ 191–92; PRSOF ¶191–92). At that point, O'Dea planned
14  to place all ten engineers on a Performance Improvement Plan ("PIP") because he
15  thought it was required by company policy. (DSOF ¶ 193; PRSOF ¶ 193). However,
16  O'Dea later learned that a PIP was not mandatory and he did not place any engineers,
17  including Plaintiff, on a PIP. (DSOF ¶¶ 194–95, 204–06; PRSOF ¶¶ 194–95, 204–06).

18      On February 3, 2011, Plaintiff filed an administrative charge with the EEOC
19  against GDC4S alleging that her 2004 removal from the Rescue 21 program, various
20  denials of program assignments since that time, and January 2011 placement on a PIP
21  (which did not actually occur) were motivated by racial and sex-based discrimination and
22  retaliation for her 2004 DRP complaint. (DSOF ¶ 207; PRSOF ¶ 207). Later that
23  February, Plaintiff filed charges with the OFCCP claiming that the same actions occurred
24  because of her association with a disabled son. (*Id.*). Kevin Jardine, a HR representative,
25  received the EEOC and OFCCP charges, forwarded them to the legal department, and did

26  ───────────────

27      [2] The group of engineers who received an NI rating included five Caucasian
28  males, one Caucasian female, one Hispanic male, one Hispanic female, one African-
    American male, and one African-American female (Plaintiff). (DSOF ¶ 192; PRSOF
    ¶ 192).

not disclose the charges to O'Dea or other managers. (DSOF ¶¶ 208–10; PRSOF ¶¶ 208–10). However, O'Dea learned about the charges as part of GDC4S's legal department's investigation. (DSOF ¶ 211; PRSOF ¶ 211).

By the spring of 2011, the number of engineers O'Dea was attempting to find an assignment for had increased to 25 or 30. (DSOF ¶ 214; PRSOF ¶ 214). On March 1, 2011, O'Dea informed Plaintiff of a short assignment assisting a MUOS manager with various tasks, which Plaintiff accepted. (DSOF ¶¶ 215–16; PRSOF ¶¶ 215–16). O'Dea continued to search for longer-term projects for Plaintiff and emailed her multiple IOS requisitions, but noted that they required relocation; Plaintiff declined to apply for any of the positions (DSOF ¶¶ 217–19; PRSOF ¶¶ 217–19). Also in March, O'Dea successfully placed Plaintiff on a longer-term MUOS assignment under Ivan Hobson ("Hobson") and Starlene Maskalenko ("Maskalenko"). (DSOF ¶¶ 220–25; PRSOF ¶¶ 220–25).

Shortly after Plaintiff began working on the MUOS project, she received emails one weekend with task requests. (DSOF ¶ 249; PRSOF ¶ 249). In response, Plaintiff sent an email to Hobson and other MUOS managers on Monday, April 4, 2011 stating: "I do not work on Saturday and Sunday. On Friday's [sic] I work intermittent[ly] as needed."[3] (*Id.*). The MUOS managers expressed dissatisfaction with Plaintiff's email and forwarded it to O'Dea. (DSOF ¶¶ 253–54; PRSOF ¶¶ 253–54). In particular, Hobson expressed an expectation that Plaintiff would be available for work on Fridays.[4] (PRSOF ¶ 533). Also, Maskalenko forwarded other emails to O'Dea that indicated Plaintiff had communication performance problems prior to her April 4 email. (DSOF ¶ 254; PRSOF ¶ 254).

On April 5, 2011, O'Dea emailed HR seeking approval of a draft email response to Plaintiff. (*Id.* ¶ 538). The draft email states:

> As an exempt employee you cannot define your job to be a specific number of hours per week, nor the days you will

---

[3] In 2011, Plaintiff regularly took FMLA-protected leave approximately every other Friday in order to care for her disabled son. (*See, e.g.*, DSOF ¶¶ 262–63; PRSOF ¶¶ 262–63).

[4] Hobson also inquired of O'Dea whether Plaintiff had some sort of arrangement not to work on Fridays. (DSOF ¶ 279; PRSOF ¶¶ 279, 531–32).

> work. Anyone supporting a program must be flexible and willing to work what is asked. . . . It concerns me when I've worked so hard to find you a position on a paying program, and you tell them as an exempt employee you'll only work the schedule you've defined. *This has caused them to question your role on MUOS, and certainly your commitment to making the program a success.*

(*Id.* (emphasis added)). After various discussions between O'Dea, Plaintiff, and HR regarding Plaintiff's communication skills (s*ee* DSOF ¶¶ 250–62; PRSOF ¶¶ 250–62), Plaintiff continued working on MUOS and regularly taking FMLA leave on Fridays, and none of the MUOS program managers raised further issues about or asked that she be removed because of her work schedule. (DSOF ¶¶ 263–65; PRSOF ¶¶ 263–65). However, on April 16, Hobson complained to O'Dea about Plaintiff's performance and asked that she be removed from the MUOS program. (DSOF ¶¶ 270–74; PRSOF ¶¶ 270–74). At O'Dea's insistence, Hobson continued working with Plaintiff and Plaintiff continued to have performance problems. (DSOF ¶¶ 274–78; PRSOF ¶¶ 274–78). Then, on May 30, citing numerous documented performance problems, Hobson firmly requested O'Dea remove Plaintiff from the MUOS project; Plaintiff was removed shortly thereafter and returned to charging her time to overhead. (DSOF ¶ 277; PRSOF ¶ 277).

On June 7, 2011, GDC4S conducted a nationwide Reduction in Force ("RIF") of over 450 employees, including Plaintiff. (DSOF ¶¶ 281, 288; PRSOF ¶¶ 281, 288). As a section manager, O'Dea selected all 29 of his engineers who did not have a current or future long-term customer-funded project assignment, including Plaintiff, for the RIF.[5] (DSOF ¶ 284; PRSOF ¶ 284).

In November 2011, after the RIF, Plaintiff amended her February 2011 EEOC and OFCCP charges, filed an additional EEOC retaliation charge, eventually received right-to-sue-letters, and commenced the instant litigation. (DSOF ¶¶ 295–302; PRSOF ¶¶ 295–302; Doc. 1).

---

[5]The 29 engineers were composed of 18 Caucasian males, five Caucasian females, three Hispanic males, one African-American male, one African-American female (Plaintiff), and one Asian-American male. (DSOF ¶ 284; PRSOF ¶ 284).

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1)(A)&(B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. Further, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the

summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (internal citations omitted).

Moreover, the Ninth Circuit Court of Appeals "has set a high standard for the granting of summary judgment in employment discrimination cases." *Schnidrig v. Columbia Mach.*, *Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). As the Ninth Circuit has explained, "[w]e require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a 'searching inquiry'—one that is most appropriately conducted by the factfinder, upon a full record." *Lam v. Univ. of Hawai'i*, 40 F.3d 1551, 1564 (9th Cir. 1994) (internal quotations omitted).

## III. CROSS-MOTIONS FOR (PARTIAL) SUMMARY JUDGMENT

Plaintiff's Fourth Amended Complaint ("FAC") (Doc. 68) alleges seven causes of action against GDC4S: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964; (2) sex discrimination in violation of Title VII; (3) retaliation for opposing discriminatory practices in violation of Title VII; (4) discriminatory harassment in violation of Title VII; (5) wrongful termination in violation of Arizona law; (6) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); and (7) retaliation for using Family and Medical Leave Act ("FMLA") leave in violation of the FMLA. Plaintiff's FAC also alleges Counts Two, Three, and Seven against Defendant GD. (*Id.* at ¶¶ 76, 81, 112). In their Answer (Doc. 69), GDC4S preserves 13 "affirmative defenses"[6] to Plaintiff's claims and alleges a single counterclaim against Plaintiff for breach of contract (a confidentiality agreement) (*id.* at 15–21).

Plaintiff's Motion for Partial Summary Judgment (Doc. 85) seeks summary

---

[6] The Court notes that Defendants have labeled 13 defenses as "affirmative defenses." Except where specifically stated later in this Order, the Court takes no position on whether any or all of these 13 defenses are either actually "affirmative" or available in the instant action.

judgment on the breach of contract counterclaim and two of GDC4S's affirmative defenses: failure to mitigate damages (Doc. 85 at 5–6; *see* Answer, Doc. 69 at 14, ¶ C); and the applicable statute of limitations renders the claim untimely (Doc. 85 at 9–11; *see* Doc. 69 at 14, ¶ E). In Response (Doc. 90), GDC4S argues that disputed issues of material fact preclude summary judgment on any of these three issues. Additionally, GDC4S's Motion for Summary Judgment (Doc. 93) seeks summary judgment on each of Plaintiff's seven claims and the counterclaim. Similarly, Defendant GD seeks summary judgment on each of the three claims against it (Counts Two, Three, and Seven). (*Id.*). The Court will consider the counterclaim, affirmative defenses, and each claim in turn.

### A.     GDC4S's Counterclaim for Breach of Contract

Both Parties have moved for summary judgment on GDC4S's counterclaim for breach of contract (an employment confidentiality agreement). (Docs. 85, 93). Specifically, Plaintiff argues that GDC4S's counterclaim fails because GDC4S has not and cannot present evidence of damages. (Doc. 85 at 6–7). GDC4S argues that it is entitled to summary judgment because Plaintiff's breach is not in dispute and the contract was not unconscionable or otherwise unenforceable. (Doc. 93 at 23–24).

### 1.     Breach of Contract and Enforceability

GDC4S moves for summary judgment on its breach of contract counterclaim arguing that there is no genuine dispute of material fact that the contract (a confidentiality agreement) was enforceable and that Plaintiff breached the contract. (Doc. 93 at 23–24). With regard to the contract's enforceability, Plaintiff argues that the confidentiality agreement is invalid because it is an overly broad contract of adhesion. (DSOF ¶ 30; PRSOF ¶ 30). The Court, however, has already denied Plaintiff's similar attempt to have the contract "declared unlawful and illegal." (Plaintiff's Motion to Have Employment Agreement Declared Unlawful and Illegal, Doc. 25; March 27, 2013 Order of the Court, Doc. 42 (denying Plaintiff's motion)).

With regard to breach of the contract, Plaintiff admits that she took various documents from GDC4S and that she currently retains at least some of them.

(Defendants' Separate Statement of Facts in Response to Plaintiff's Partial Motion for Summary Judgment ("DRSOF"), Doc. 91 ¶ 39; DSOF ¶ 30; PRSOF ¶ 30). Nonetheless, Plaintiff argues that she has not breached the contract because "the documents that she retained were only related to her discrimination claims and did not contain any confidential information."[7] (PRSOF ¶ 30). Plaintiff does not dispute, however, that the plain terms of the confidentiality agreement cover "*all* documents . . . whether or not such materials contain Confidential Information." (DSOF ¶ 20; PRSOF ¶ 20). Thus, there is no genuine dispute of material fact that Plaintiff has breached the contract, regardless of the allegedly non-confidential nature of the documents she took and retains.

## 2. Damages

Plaintiff moves for summary judgment on GDC4S's breach of contract counterclaim arguing that GDC4S has not offered evidence of damages, an essential element of the claim. (Doc. 85 at 6–7). To recover on a breach of contract claim under Arizona law, "a plaintiff must show proximately caused damages." *Firetrace USA, LLC v. Jesclard*, 800 F. Supp. 2d 1042, 1054 (D. Ariz. 2010) (citing *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004); *Home Indem. Co. v. Bush*, 513 P.2d 145, 150 (Ariz. 1973)). Plaintiff contends that because GDC4S's counterclaim requests only monetary damages (Doc. 69 at 20) and GDC4S has not demonstrated that Plaintiff sold or otherwise profited from the documents, GDC4S has no proof of damages. (Doc. 85 at 7). In Response, GDC4S argues that it is nonetheless entitled to monetary damages under both the terms of the contract[8] and Arizona's fee shifting statute[9] in the amount of its

---

[7] The Court notes that there appears to be some dispute as to what, exactly, is contained in the documents Plaintiff took and retains. Although Plaintiff alleges that the documents "were related to her discrimination claim" (PRSOF ¶ 30), GDC4S characterizes them as "including copies of designs, processes and meeting minutes, copies of work performed by co-workers, documents showing organization charts, management structure and assignment allocation, and documents related to financial records, contract awards, acquisitions and new hires" (Doc. 90 at 10 (citing DRSOF ¶ 39)).

[8] "In the event that [GDC4S] is forced to and successfully does enforce this Agreement against me in any court, I will reimburse and indemnify [GDC4S] for the actual costs incurred by [GDC4S] in enforcing this Agreement, including but not limited to attorneys' fees." (Employee Confidentiality Agreement, Doc. 91-1 at 47; *see* DRSOF

1   costs and attorneys' fees "incurred to enforce the contract," which "cannot be determined

2   fully until the counterclaim is litigated to conclusion." (Doc. 90 at 11).

3       In a recent case strikingly similar to the instant case and predicated on the same

4   contractual terms, the Court has previously confronted Plaintiff's argument that currently

5   unquantified attorneys' fees, alone, are insufficient proof of damages. *U.S. ex rel.*

6   *Cafasso v. Gen. Dynamics C4 Sys.,* No. CV-06-1381-PHX-NVW, 2009 WL 1457036

7   (D. Ariz. May 21, 2009), *aff'd sub nom. Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys.,*

8   *Inc.*, 637 F.3d 1047 (9th Cir. 2011). In *Cafasso*, a GDC4S employee who believed she

9   had been wrongfully terminated removed more than ten gigabytes of GDC4S's data and

10  documents and refused to return them. (*Id.* at *13 n.2). Although the plaintiff did not sell

11  the documents or profit from her breach, the Court found that "there is no question

12  GDC4S has been damaged" by the cost of years of litigation to enforce its contractual

13  rights. (*Id.* at *13).

14      Plaintiff contends (Doc. 94 at 3–4) that *Cafasso* is inapposite because in *Cafasso*,

15  the employer also sought equitable relief in the form of an injunction ordering the

16  plaintiff to return GDC4S's documents and data (*Cafasso*, 2009 WL 1457036, at *8, 13–

17  15). In contrast, here, GDC4S seeks only attorneys' fees and Plaintiff contends that,

18  rather than attempting to keep the documents confidential, GDC4S "has now publicly

19  disclosed the exact same documents in its motion for summary judgment, making the

20  issue moot." (*Id.*).

21      The Court disagrees with Plaintiff's assessment. The issue is not moot for two

22  reasons. First, the record is unclear (and Plaintiff cites no evidence supporting its

23  contention) that GDC4S has now publicly disclosed the entirety of the documents

24  Plaintiff took. Second, even if GDC4S has disclosed every document Plaintiff kept, it is

25  undisputed that GDC4S incurred attorneys' fees seeking return of the documents prior to

26  _____

    ¶ 38).

27      [9] Ariz. Rev. Stat. § 12-341.01(A) provides that "[i]n any contested action arising

28  out of a contract, express or implied, the court may award the successful party reasonable
    attorney fees."

this point. Thus, at most, GDC4S's publication of certain documents indicates only the futility of further seeking their return; it has no effect on the damage GDC4S has already suffered.

Additionally, Plaintiff contends that GDC4S's apparent current lack of interest in the return of the documents proves that GDC4S "has failed to show that its underlying claim served any legitimate purpose." (Doc. 94 at 3–4). This argument, however, ignores the undisputed facts. GDC4S first learned that Plaintiff possessed GDC4S's documents on September 11, 2012, during discovery. (DRSOF ¶ 39). At that time, the scope of the documents was unclear: Plaintiff claims they were discrimination related only, but GDC4S characterizes them far more broadly. (PRSOF ¶ 30; DRSOF ¶ 39). Beginning the very next day, GDC4S repeatedly sought the return of the documents. (DRSOF ¶ 39). On September 24, 2012, the Court held a Rule 16 Scheduling Conference and ordered the Parties to confer to resolve the confidential documents issue. (Doc. 26). A mere four days later, Plaintiff moved to file 250 pages of GDC4S's documents with the Court as "evidence" (Docs. 29, 30, 35)—a motion GDC4S successfully opposed (Docs. 32, 42). Clearly, GDC4S has previously expended time and treasure successfully fighting to preserve the GDC4S's contractual confidentiality rights. Lastly, Plaintiff's May 6, 2013 refusal to return the documents because GDC4S would not agree to dismiss the counterclaim and waive attorneys' fees and costs upon their return (Doc. 94 at 3–4) does not evidence a lack of legitimate purpose in GDC4S's counterclaim; rather, it demonstrates the wastefulness of Plaintiff's intransigence.

In sum, GDC4S has undoubtedly suffered damages—in the form of attorneys' fees and costs—proximately caused by Plaintiff's breach of contract.[10] Accordingly, the Court grants GDC4S's motion for summary judgment and denies Plaintiff's motion for partial

---

[10] Plaintiff also argues that GDC4S "never provided a damages calculation for its counterclaim as required by Federal Rule of Civil Procedure 26(a)(1)(iii). Given that GDC4S's damages are an as-yet-to-be determined amount of attorneys' fees and costs, previous disclosure of a specific damages calculation would have been both impossible and inappropriate. Furthermore, GDC4S's Counterclaim explicitly provided Plaintiff notice that GDC4S was pursuing both its "actual damages" and "its costs and attorneys' fees." (Doc. 69 at 20 ¶¶ E–F).

summary judgment with respect to the Breach of Contract Counterclaim.

## B.      GDC4S's Affirmative Defenses

In her motion for partial summary judgment (Doc. 85), Plaintiff argues that she is entitled to summary judgment on two of Plaintiff's Affirmative defenses: (1) failure to mitigate damages; and, (2) statute of limitations of the various EEOC (Title VII) claims.

### 1.      Failure to Mitigate Damages

Plaintiff argues that she is entitled to summary judgment on GDC4S's affirmative failure to mitigate damages defense "because [GDC4S] failed to produce evidence of equivalent, open positions for which the Plaintiff failed to apply." (Doc. 85 at 5). To prevail on a failure to mitigate damages defense, GDC4S has the burden of proving both that there were substantially equivalent jobs available and that Plaintiff failed to use reasonable diligence in seeking one. *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995).

Plaintiff's motion does not argue that there is no genuine dispute of material fact regarding Plaintiff failing to use reasonable diligence.[11] (Doc. 85 at 5–6). Instead, Plaintiff challenges GDC4S's ability to prove that substantially equivalent jobs were available to Plaintiff. (*Id.*). In Response, GDC4S provides documents Plaintiff produced during discovery that purport to show Plaintiff received notice of approximately 100 available positions from several employers during the relevant time period. (DRSOF ¶¶ 22, 29). These documents consist of dozens of pages of job search results from both job search engines and individual employers' websites that were responsive to search parameters provided by Plaintiff.[12] (DRSOF ¶¶ 22, 29 (citing Townsend Decl., Doc. 91-2 ¶¶ 3, 5 & Exs. 1, 3)).

Despite producing these documents herself, Plaintiff objects to GDC4S's use of

---

[11] Indeed, upon review of the evidence cited in GDC4S's Response (Doc. 90 at 7–9), the Court finds that GDC4S has demonstrated a genuine dispute of material fact with regard to the reasonable diligence element.

[12] Plaintiff used Boolean searches such as " 'Application Developer' OR 'Architecture' OR 'Cloud' AND Phoenix." (Doc. 91-2 at 9).

these documents on the grounds that they are inadmissible hearsay under Federal Rule of Evidence 801 when used to prove the truth of the matter asserted—that the listed jobs were, in fact, available at the relevant time. Plaintiff further argues that Defense Counsel can only authenticate that these documents were produced by Plaintiff and cannot establish the necessary foundation for a business records exception to the rule against hearsay. *See* F.R. Evid. 803. Although Plaintiff's hearsay objection is likely to be well taken, because the evidence could conceivably be converted into an admissible form for trial, the Court will consider the evidence for the purposes of summary judgment. *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."). Thus, GDC4S has produced sufficient evidence to create a genuine dispute of material fact that certain jobs were available.

GDC4S, however, must also demonstrate that available jobs bear substantial equivalence to Plaintiff's previous position at GDC4S. *Odima*, 53 F.3d at 1497. "Substantially equivalent employment is that which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Cassella v. Mineral Park, Inc.*, No. CV-08-01196-PHX-MHM, 2010 WL 454992, at *5 (D. Ariz. Feb. 9, 2010) (quotation omitted). Here, the job search results proffered by GDC4S consist only of job titles, employers, and locations.[13] (Townsend Decl., Doc. 91-2 at Exs. 1, 3).

Relying on *Cassella*, 2010 WL 454992, Plaintiff argues that GDC4S's burden on summary judgment requires GDC4S to specifically "explain how these positions have virtually identical promotional opportunities, job responsibilities, or working conditions as" Plaintiff's previous position with GDC4S. (Doc. 94 at 5). *Cassella*, however, is

---

[13] For example: "Software Engineer II at Honeywell in Phoenix, AZ" (Doc. 91-2 at 7), "Lead Data Architect Job" in Phoenix at American Express (*id.* at 9), and "IT Software Developer III (Senior CCL / Rules & Reports Writer) Job – Phoenix" at the Mayo Clinic (*id.* at 17).

inapposite because, unlike here, in *Cassella*, defendant employer brought the motion for summary judgment. Thus, in *Cassella*, the employer had a burden of demonstrating that there was no genuine dispute of material fact. In contrast, here, GDC4S is the non-movant and must merely establish a genuine dispute of material fact to survive summary judgment. *Celotex*, 477 U.S. at 322. Because of the sheer number of jobs specifically responsive to Plaintiff's own search parameters, the Court finds it reasonable to infer that at least one of the dozens of potentially equivalent jobs may have been, in fact, equivalent to Plaintiff's previous position at GDC4S. Thus, the Court finds that, at the summary judgment stage where all reasonable inferences must be made in favor of the non-movant, GDC4S's failure to proffer detailed descriptions of the jobs is not fatal.[14]

Lastly, Plaintiff argues that because some of the job search results were obviously inferior to her previous position,[15] GDC4S has failed in its burden. Although a "claimant need not go into another line of work, accept a demotion, or take a demeaning position," to mitigate damages, *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 232 (1982), Plaintiff's argument is a red herring because the vast majority of the positions were, based on job titles, potentially equivalent to Plaintiff's previous position at GDC4S (*see* Townsend Decl., Doc. 91-2 at Exs. 1, 3).

In sum, the Court finds that GDC4S has met its summary judgment burden on both elements of its failure to mitigate affirmative defense. Accordingly, the Court denies Plaintiff's motion for partial summary judgment with respect to GDC4S's failure to mitigate affirmative defense.

---

[14] Plaintiff also cites to *Kawar v. JPMorgan Chase & Co.*, No. CV-08-0046-PHX-DGC, 2009 WL 1698918, at *6–7 (D. Ariz. June 16, 2009) for the proposition that a defendant-employer non-movant's failure to provide salary information about allegedly available jobs prevents comparison to the plaintiff's previous position. In *Kawar*, however, the employer presented only two potentially equivalent available jobs of its own choosing. In contrast, GDC4S presents dozens of potentially equivalent available jobs responsive to Plaintiff's own search terms.

[15] Plaintiff cites to results such as "payroll assistant job," "accountant job," and "student nurse extern (unpaid)."

1

**2.      Statute of Limitations and Equitable Tolling**

Plaintiff argues that she is entitled to summary judgment on GDC4S's affirmative statute of limitations defense to Plaintiff's EEOC claims because she is entitled to equitable tolling. (Doc. 85 at 1–2, 7–11). GDC4S argues that genuine issues of material fact preclude this. (Doc. 90 at 2–7). However, because the Court grants summary judgment to GDC4S on the merits of each of Plaintiff's EEOC and ADA counts (Counts One through Six), *infra* III.C., Plaintiff's motion on this issue is moot.[16] Accordingly, the Court denies without prejudice Plaintiff's motion for partial summary judgment with respect to GDC4S's statute of limitations affirmative defense.

**C.      Plaintiff's Individual Claims**

As stated above, Plaintiff's FAC alleges seven counts against GDC4S: (1) race discrimination in violation of Title VII; (2) sex discrimination in violation of Title VII; (3) retaliation for opposing discriminatory practices in violation of Title VII; (4) discriminatory harassment in violation of Title VII; (5) wrongful termination in violation of Arizona law; (6) disability discrimination in violation of the ADA; and (7) retaliation for using FMLA leave in violation of the FMLA. (Doc. 68). Plaintiff's FAC also alleges Counts Two, Three, and Seven against Defendant GD. (*Id.* at ¶¶ 76, 81, 112).

**1.      Claims Against Defendant GD**

Defendant GD argues that it is entitled to summary judgment on all three counts against it (Counts Two, Three, and Seven) because GD, as merely the corporate parent of GDC4S, neither employed Plaintiff nor exercised control over the GDC4S managers that employed Plaintiff. (Doc. 93 22–23 (citing DSOF ¶¶ 1–3)). Courts may treat two entities as one based on four factors: (1) interrelated operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. *Morgan v. Safeway Stores, Inc.,* 884 F.2d 1211, 1213 (9th Cir. 1989) (citing *Childs v.*

---

[16] The Parties' briefs on the statute of limitations affirmative defense make no mention of Plaintiff's FMLA Retaliation claim. (Docs. 85, 90, 94). Accordingly, the Court takes no position on the availability or merits of a statute of limitations affirmative defense to Plaintiff's FMLA Retaliation claim (Count Seven).

*Local 18, Int'l Bhd. of Elec. Workers,* 719 F.2d 1379, 1382 (9th Cir. 1983); *see also Int'l Bhd. of Teamsters v. Am. Delivery Serv. Co., Inc.,* 50 F.3d 770, 775 (9th Cir. 1995) (using factors as "guideposts" to determine LMRA § 301(a) liability while also looking to all the circumstances).

Here, Plaintiff does not dispute GD's lack of control over GDC4S's day-to-day operations, personnel decisions, or Plaintiff's employment. (PRSOF ¶¶ 1–3). Furthermore, Plaintiff's Response (Doc. 95) fails to contest GD's argument that it is not a proper defendant in this suit. Therefore, the Court finds no dispute of material fact that, for purposes of Plaintiff's suit, GD and GDC4S are separate entities. Accordingly, the Court grants Defendant GD's Motion for Summary Judgment on Counts Two, Three, and Seven of Plaintiff's FAC.

### 2.     Counts One and Two: Race and Sex Discrimination Through Disparate Treatment

Plaintiff's first and second causes of action allege that GDC4S violated Title VII, 42 U.S.C. § 2000e-2(a), by treating Plaintiff inconsistently from GDC4S's male employees and non-African American employees. (Doc. 68 ¶¶ 66–80). This provision of Title VII makes "disparate treatment" based on sex or race a violation of federal law. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061–62 (9th Cir. 2002) (citation omitted); *see Johnson v. Teltara, LLC*, No. CV 08-1894-PHX-JAT, 2010 WL 2873492, at *4 (D. Ariz. July 20, 2010).

#### a.     Legal Framework for Disparate Treatment Discrimination Claims

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). To prevail on a Title VII claim, the plaintiff must prove that an adverse employment action was taken "because of" unlawful discrimination. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 857 (9th Cir. 2002). Title VII disparate-treatment claims like Plaintiff's "require the plaintiff to prove that the employer acted with conscious intent to discriminate." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805–06 (1973). Specifically, the

plaintiff must show that (1) she belongs to a protected class, (2) she performed according to her employer's legitimate expectations, (3) she was subjected to an adverse employment action, and (4) similarly situated individuals outside her protected class were treated more favorably. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (internal citations omitted). The Ninth Circuit "has explained that under the *McDonnell Douglas* framework, 'the requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.' " *Id.* (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

Furthermore, Courts employ a burden-shifting analysis for Title VII claims:

> [T]he plaintiff must establish a prima facie case of discrimination. If the plaintiff succeeds in doing so, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination.

*Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640 (9th Cir. 2004) (quoting *McDonnell Douglas*, 411 U.S. at 802–05). At the summary judgment stage, the plaintiff does not have to prove that the employer's reason for firing her was pretext for discrimination, but the plaintiff must introduce evidence sufficient to raise a genuine issue of material fact as to whether the employer's reason was pretextual. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000).

### b.   Plaintiff's Prima Facie Case

Initially, the Court notes that both Parties comingle their race and sex-based disparate treatment arguments.[17] (*See* Doc. 93 at 9–18; Doc. 95 at 9–14; Doc. 102 at 1–5). Furthermore, the same Title VII legal standards apply to both causes of action. Accordingly, the Court considers Counts One (Race) and Two (Sex) together.

---

[17] The Parties also comingle their ADA-based disability discrimination arguments with the race and sex-based arguments. However, because the elements of a prima facie disability-based case differ from those of race and sex-based cases, the Court considers Plaintiff's ADA claim separately.

Here, Plaintiff alleges several discrete events of disparate treatment across two categories of potentially adverse employment action: (1) termination of employment as part of the June 2011 Reduction in Force; and (2) work assignments in the context of several individual projects. The Court considers each in turn.

### 1.    Termination: June 2011 RIF

GDC4S argues not only that Plaintiff fails to make a prima facie case, but also that Plaintiff has failed to exhaust administrative remedies with regards to race and sex-based discriminatory discharge. (Doc. 93 at 9). Specifically, GDC4S explains that, with regard to the June 2011 RIF, Plaintiff's initial and revised EEOC charges alleged only race and sex-based retaliation, not discriminatory discharge, and the EEOC has not investigated Plaintiff's discharge for race or sex-based discrimination. (*Id.* (citing DSOF ¶¶ 295–301 (citing Loretta Cheeks' Nov. 14, 2011 EEOC Charge re: RIF, Doc. 88-3 at 70))). Plaintiff has not disputed GDC4S's several factual statements concerning the contents and amendments to Plaintiff's EEOC charges (PRSOF ¶¶ 295–301), except to note that she was "not a lawyer."[18] (PRSOF ¶ 299).

The Court construes Plaintiff's "EEOC charges with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." *Lyons v. England*, 307 F.3d 1092, 1104 (9th Cir. 2002) (internal quotation omitted). Further, the Court considers Plaintiff's "claims to be reasonably related to allegations in the [EEOC] charge to the extent that those claims are consistent with [Plaintiff's] original theory of the case, as reflected in [Plaintiff's] factual allegations and [her] assessment as to why the employer's conduct is unlawful." *Id.*

Here, even construing Plaintiff's RIF EEOC charge with the utmost liberality, Plaintiff's plain language solely alleges retaliation.[19] (Loretta Cheeks' Nov. 14, 2011

---

[18] Similarly, Plaintiff's Response fails to contest, or even mention, GDC4S's argument on failure to exhaust administrative remedies.

[19] The "Particulars" section of Plaintiff's EEOC charge reads, in its entirety:

> On or about June 7, 2011, I was terminated; I believe that my involuntary termination without cause is directly related to

EEOC Charge re: RIF, Doc. 88-3 at 70). Additionally, Plaintiff checked only the "Retaliation" box. (*Id.*). In contrast, on the same day, Plaintiff amended her February 2011 EEOC charge regarding various work assignments in which she checked the "Race," "Sex," and "Retaliation" boxes while specifically including claims of race and sex-based discrimination in her description of the particulars. (Loretta Cheeks' Nov. 14, 2011 EEOC Charge re: Failures to Promote, Doc. 88-3 at 80–81). Furthermore, in her contradicting statement of facts, Plaintiff describes her RIF EEOC charge as asserting that she "was selected for the RIF based on not having an assignment, and she alleged she did not have an assignment because of her race and gender." (PRSOF ¶ 300). Thus, even construing Plaintiff's theory of the case liberally, the Court finds that Plaintiff's RIF EEOC charge expresses a theory of retaliation, not unlawful race or sex-based discharge. Because Plaintiff's EEOC charge narrowly focused exclusively on retaliation, the Court finds that nothing in it would have lead the EEOC to investigate Plaintiff's RIF termination for race or sex-based discrimination or provided notice to GDC4S of such a claim. *See Loos v. Lowe's HIW, Inc.*, 796 F. Supp. 2d. 1013, 1019 (D. Ariz. 2011). Thus, the Court finds that Plaintiff did not exhaust her race or sex-based RIF claims at the administrative level. Accordingly, the Court lacks subject matter jurisdiction (*id.*) and dismisses Plaintiff's race and sex-based discrimination claims to the extent that they allege Plaintiff's termination in the June 2011 RIF as an unlawful adverse employment action.[20]

---

the fact that I was placed on a Performance Improvement Plan and because I filed a previous sex and race discrimination grievance in 2004 and a previous EEOC charge (540-2011-01169) in February 2011.

I believe I have been retaliated against in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Loretta Cheeks' Nov. 14, 2011 EEOC Charge re: RIF, Doc. 88-3 at 70).

[20] Because the Court does not have subject matter jurisdiction to consider this issue, the Court does not consider GDC4S's additional argument that Plaintiff fails to demonstrate a prima facie case of race and sex-based discriminatory discharge.

### 2.     Work Assignments: Internal Projects

Initially, the Court notes that Plaintiff's FAC (Doc. 68) alleges numerous discrete instances where Plaintiff was either removed from or not assigned to various customer-funded projects during her seven years[21] of employment. Consequently, GDC4S's Motion for Summary Judgment (Doc. 93) includes arguments related to four different project-assignment decisions that may have occurred no earlier than 300 days prior to Plaintiff's initial February 3, 2011 work-assignment EEOC charge: IOS (*id.* at 13 n.6, 16–18); SGSS (*id.* at 13–15); MUOS (*id.* at 15–16); and Battle Management Systems Division ("BMSD") (*id.* at 16 n.8). In her Response, Plaintiff's initial recitation of facts mentions the four projects listed above and one additional Federal Aviation Administration ("FAA") project. (Doc. 95 at 2–9). Nonetheless, the substance of Plaintiff's Response relies exclusively on the SGSS program in order to establish a prima facie "failure to consider" case of disparate treatment and pretext. (*Id.* at 11–14; *see id.* at 9–11). Thus, Plaintiff does not appear to dispute either GDC4S's arguments (Doc. 93 at 11–18) or material factual support (*see* cited DSOF paragraphs; PRSOF paragraphs generally not disputing same) that Plaintiff fails to present a prima facie case of race or sex-based discrimination in the non-SGSS project assignments.[22] Upon review of the undisputed facts, the Court finds that even when viewed in the light most favorable to Plaintiff, Plaintiff has not established a genuine dispute of material fact with regard to non-SGSS project assignments. Accordingly, the following analysis specifically addresses the SGSS program assignment decision.

### a.     Work Assignment: SGSS Project[23]

---

[21] Plaintiff was employed by GDC4S from 2001 through June 2011. (DSOF ¶¶ 32, 288; PRSOF ¶¶ 32, 288).

[22] Presumably, Plaintiff's approach reflects Plaintiff's counsel's legal analysis of the merits of the various claims and demonstrates Plaintiff's counsel prioritization of the SGSS-assignment. Indeed, at the oral argument, Plaintiff's Counsel similarly relied solely on the SGSS non-assignment

[23] GDC4S preliminarily argues that Plaintiff's SGSS non-assignment cannot support her discrimination charges because work assignments are not adverse employment actions. Courts have held that work assignments can be adverse employment

In the failure to consider for a particular work-assignment context, Plaintiff "can make out a prima facie case of discrimination by showing that (1) [s]he belongs to a statutorily protected class, (2) [s]he applied for and was qualified for an available position, (3) [s]he was rejected despite [her] qualifications, and (4) after the rejection, the position remained available and the employer continued to review applicants possessing comparable qualifications." *Lyons*, 307 F.3d at 1112.

First, the Parties do not dispute that as an African-American female, Plaintiff belongs to two protected classes. Second, it is undisputed that the SGSS program managers knew that Plaintiff was available and interested in an SGSS assignment. (DSOF ¶ 184; PRSOF ¶¶ 184, 424). Additionally, although the SGSS program sought engineers with certain specialized expertise (DSOF ¶¶ 181–84), the informal staffing process did not publish specific qualifications for its positions. Thus, because Plaintiff demonstrates educational qualifications greater than those of at least some SGSS-assigned engineers,[24] Plaintiff satisfies the qualifications aspect of element two. *See Lyons*, 307 F.3d at 1114 ("where the employer has not published the qualifications for positions that were awarded without a competitive application process, it would be unreasonable to require a plaintiff to present direct evidence of the actual job

---

actions even where, as here, an employee's title, pay grade, and employment benefits remained the same. *See, e.g.*, *Lyons*, 307 F.3d at 1101 (where the adverse employment action was the failure to assign an employee to a temporary "detail" that included other job duties without any upgrade in pay or benefits because previous assignments to "details" were considered a positive factor during promotion considerations). Here, even if true that not having a customer-funded project assignment did not meaningfully impact an engineer's career during most of Plaintiff's employment, it is undisputed that as early as May 2010, Plaintiff's supervisor, O'Dea, began stressing the importance of being on a customer-funded project in order to minimize "overhead." (DSOF ¶¶ 96, 103, 114–15; PRSOF ¶¶ 96, 103, 114–15 (not disputing same)). Therefore, it is reasonable to infer that at the time SGSS made its assignment decisions (late 2010 and early 2011), both engineers and their supervisors recognized assignment to SGSS (or another customer-funded project) as materially preferable to non-assignment. Accordingly, Plaintiff's SGSS non-assignment is an adverse employment action.

[24] An examination of the educational credentials of the various SGSS-assigned engineers reveals that the minimum educational qualifications appear to have been a Bachelor of Science degree. (GDC4S's Sworn Resp. to Plaintiff's 30(B)(6) Notice, Doc. 99-1 at 10–24, 30–31; PRSOF ¶ 422). In contrast, Plaintiff holds a Master of Science degree. (Cheeks Decl., Doc. 96-1 at 2).

qualifications as part of his prima facie case").

With regard to the third and fourth *McDonnell Douglas* elements (Plaintiff's rejection in favor of other comparatively qualified individuals), GDC4S argues that Plaintiff cannot "raise a triable issue of fact over not being assigned to the [SGSS] program because she was never specifically considered for it" during the project managers' informal selection of engineers that they were already familiar with. (Doc. 93 at 14 (citing, *e.g.*, *Greene v. Potter*, 557 F.3d 765, 771 (7th Cir. 2009) (no discrimination where manager gives preference to friends over others)).[25] However, as Plaintiff explains in her Response, a prima facie case of disparate treatment can be made where, as here, an employer fails to consider an otherwise qualified individual and then considers comparably qualified applicants. *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1359 (9th Cir. 1985); *see Lyons*, 307 F.3d at 1114. Thus, GDC4S's admission that the SGSS managers did not consider Plaintiff and then hired other arguably comparably qualified engineers satisfies the remainder of Plaintiff's prima facie burden.

### c.   Defendant's Articulated Legitimate, Non-Discriminatory Reasons for Plaintiff's SGSS non-Assignment and Plaintiff's Evidence of Pretext

GDC4S argues that Plaintiff's lack of relevant technical experience constitutes a legitimate, non-discriminatory reason for Plaintiff's SGSS non-assignment. GDC4S argues, and the undisputed evidence demonstrates, that the SGSS hiring managers assigned engineers with highly technical experience and knowledge of recent technology, NASA, satellites, and the various component parts of the SGSS project. (GDC4S's Sworn Resp. to Plaintiff's 30(B)(6) Notice, Doc. 99-1 at 10–24; DSOF ¶¶ 180–84). At the relevant time, however, Plaintiff's résumé showed a "people management" career path with only very narrow recent technology experience (DSOF ¶ 160; PRSOF ¶ 160) and her only arguably relevant experience was on a 2005 MUOS project five years earlier (DOSF ¶ 181; PSOF ¶ 181; *see* DSOF ¶¶ 82, 87, 91; PRSOF ¶¶ 82, 87, 91, 424).

---

[25] For purposes of the *McDonnell Douglas* burden-shifting framework, GDC4S's arguments about a lack of discriminatory intent in the selection of other engineers is relevant towards the pretext analysis, not Plaintiff's prima facie case.

Additionally, the undisputed evidence shows that 40 of the 72 SGSS positions were filled by systems engineers and Plaintiff concedes that she has "never worked as a systems engineer." (DSOF ¶ 118; PRSOF ¶ 118 (not disputing same)). Thus, GDC4S has clearly articulated a legitimate, non-discriminatory reason for Plaintiff's SGSS non-assignment.

With regard to pretext, Plaintiff's scant argument, in its entirety, is as follows:

> Here, Defendant's explanation is that SGSS "largely" relied on personal experiences, but in other cases did not. [DSOF] ¶ 184. However, this reason does not address Plaintiff specifically. Furthermore, evidence shows Plaintiff was considered and rejected for not having the right "skillset," which contradicts Defendant's explanation and is another content-less "non-reason." *Quaranta v. Mgmt. Support*, 255 F. Supp. 2d 1040, 1051 (D. Ariz. 2003) (holding contradictory explanations is [sic] evidence of pretext).

(Doc. 95 at 13–14). Plaintiff's assessment of the evidentiary record, however, is fatally mistaken. When SGSS first began staffing, O'Dea submitted the names and credentials of dozens of engineers under O'Dea, including Plaintiff, to the SGSS hiring managers, Worger and Pipitone. (DSOF ¶¶ 179–84; PRSOF ¶¶ 179–84). Worger and Pipitone, however, made most of the initial staffing decisions based on their "personal knowledge of each individual's work experiences relevant to the SGSS program." (DSOF ¶ 182; PRSOF ¶ 182). Consequently, Worger and Pipitone did not specifically consider dozens of engineers with whom they had not had personal experience, including Plaintiff. (DSOF ¶ 184; PRSOF ¶ 184).

Nonetheless, without citation to the record, Plaintiff argues that she was specifically considered and rejected for an SGSS assignment because she did not have the right "skillset." (Doc. 95 at 13). Upon careful review of the record, the Court believes Plaintiff is referring to an August 2010 exchange between O'Dea and Tyrone Strozier ("Strozier"), the SGSS program manager to whom Worger and Piptone reported. O'Dea contacted the leadership of multiple programs, not just SGSS, in an attempt to place Plaintiff on a customer funded program. (Weeks Decl., Doc. 98 at 3; *see* PRSOF ¶ 431). Strozier, who had had personal knowledge of Plaintiff's skills and experience from a previous project, replied that the SGSS program did not have a fit for her skillset at that

time. (*Id.*). Strozier's informal evaluation of Plaintiff's skillset and experience for SGSS staffing is consistent with Worger and Pipitone's similar staffing evaluations of the engineers, including Plaintiff, submitted for their consideration. Thus, the Court finds no contradiction.

Furthermore, to the extent that Plaintiff is instead referring to an August 2010 "hallway" conversation between her and Strozier about a specific SGSS opening (Weeks Decl., Doc. 98 at 4; PRSOF ¶ 432), the Court notes that the particular position was for a "technical point of contact for subcontracts manager." Given that Strozier had personal knowledge of Plaintiff's project lead (people management) experience and knew that she did not have the requisite technical experience, Strozier's explanation that he "talked to a few people" about Plaintiff's request but never seriously discussed it with a functional manager (*id.*) is entirely consistent with GDC4S's general explanation that Plaintiff was never specifically considered for a SGSS assignment because of her mismatched skillset.

Thus, the Court finds no reasonable dispute of material fact evidencing a contradiction in GDC4S's explanations for Plaintiff's SGSS non-assignment. Because Plaintiff appears to rest her pretext argument solely upon this perceived contradiction, the Court finds that Plaintiff has not introduced evidence sufficient to raise a genuine issue of material fact as to whether the employer's reason was pretextual. Accordingly, the Court grants GDC4S's motion for summary judgment with respect to Counts One and Two, Title VII Race and Sex Discrimination.

### 3. Count Three: Retaliation for Complaints of Sex and Race Discrimination (Title VII)

Plaintiff's third cause of action alleges that, in violation of Title VII, GDC4S terminated her employment in retaliation for Plaintiff's complaint of sex and race discrimination. (Doc. 68 ¶¶ 81–88). Title VII prohibits employers from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

#### a. Legal Framework

The *McDonnell Douglas* framework and allocation of proof that governs disparate

treatment claims also governs retaliation claims. *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987) (citing *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 784 (9th Cir. 1986). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation. *McDonnell Douglas*, 411 U.S. at 802.  To establish a prima facie case of retaliation, a plaintiff must show: (1) engagement in a protected activity; (2) an adverse employment action; and, (3) a causal link between the two. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). If the plaintiff establishes a prima facie case of retaliation, the defendant has the burden of articulating a legitimate, non-retaliatory reason for its action. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005); *McDonnell Douglas*, 411 U.S. at 802. Once the defendant has presented a purpose for the action, the plaintiff bears the ultimate burden of providing evidence that the defendant's reason is "merely a pretext for a retaliatory motive." *Id.*; *McDonnell Douglas*, 411 U.S. at 804.

### b.       Prima Facie Case

First, Plaintiff has offered enough evidence to show two protected activities: (1) complaints of sex-based discrimination in her internal 2004 Dispute Resolution Program ("DRP") complaint (DSOF ¶¶ 69–76; PRSOF ¶¶ 69–76), and (2) complaints of race and sex-based discrimination and retaliation in her February 2011 EEOC and OFCCP complaints (DSOF ¶ 207; PRSOF ¶ 207). Second, Plaintiff has clearly demonstrated at least one adverse employment action: her June 2011 termination as part of GDC4S's RIF. (DSOF ¶ 281; PRSOF ¶ 281). Additionally, Plaintiff scantly argues that her January 2011 "Needs Improvement" rating and various unarticulated "work assignments" [26] constitute adverse employment actions for the purposes of demonstrating a prima facie case of retaliation. (Doc. 95 at 14–15). The Court need not determine whether these additional employment actions were adverse, however, because even

---

[26] Throughout her Complaint, Plaintiff appears to refer to five categotries of project-staffing decisions: SGSS by Worger, Pipitone, and Strozier; IOS by Paul Alonge, Cliff Willis, Ron Wood, and Scott Jamison; BMSD by Raul Monreal; FAA by Mike Monteilh; and MUOS by Ivan Hobson.

assuming *in arguendo* that they were, Plaintiff has failed to demonstrate a prima facie causal link.

> [U]ntil recently in the Ninth Circuit, the plaintiff in a Title VII retaliation claim could establish the causal element of a retaliation claim by merely showing that the protected activity was a motivating factor in the adverse employment action. However, following the recent United States Supreme Court decision in *University of Texas Southwestern Medical Center v. Nassar*, the causal link between the protected activity and the employer's action in a retaliation claim under Title VII must be "proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 133 S. Ct. 2517, 2533 (2013).

*Drottz v. Park Electrochemical Corp.*, No. CV 11-1596-PHX-JAT, 2013 WL 6157858, at *14 (D. Ariz. Nov. 25, 2013). Accordingly, Plaintiff must show that she would not have suffered the adverse employment action but-for either her 2004 DRP or her 2011 administrative complaints of alleged race and sex discrimination.

Here, Plaintiff provides no direct evidence of but-for causation, and instead asks the Court to infer causation through proximity in time and by inferring knowledge of the complaints on her superiors. The Court, however, does not find such inferences reasonable. Plaintiff broadly claims to have suffered "a pattern of retaliation after her initial complaint" culminating in being "laid off for performance problems a few weeks later" (Doc. 95 at 15), but cites to no relevant[27] evidence of record to support an inference of race or sex-based retaliation.

With regard to Plaintiff's January 2011 "Needs Improvement" rating for her 2010 performance, it is undisputed that O'Dea expressed concern about engineers', including Plaintiff's, excessive "overhead" time[28] shortly after O'Dea became National Systems

---

[27] In the more than two pages arguing that the evidence establishes a prima facie case of Title VII retaliation, Plaintiff cites only to paragraphs 538 and 544 of the PRSOF. Both of these paragraphs, however, concern Plaintiff's April 4 email about her Friday schedule. As such, the paragraphs may be relevant to Plaintiff's FMLA retaliation claim (Count 7), but are not relevant to Plaintiff's Title VII retaliation claim.

[28] "Overhead" is time attributed to GDC4S generally, not to a specific project,

Division ("NSD") Section Manager (and Plaintiff's supervisor) in May 2010 and even warned Plaintiff in August 2010 that he was considering rating her "Needs Improvement" because she was not on a customer-funded project.[29] (DSOF ¶¶ 96, 103, 114–15; PRSOF ¶¶ 96, 103, 114–15 (not disputing same)). Critically, this occurred months *before* O'Dea learned of Plaintiff's 2004 DRP complaint in December 2010. Thus, even though Plaintiff (along with nine other engineers who had not engaged in a protected activity) received a "Needs Improvement" rating in January 2011, O'Dea's implementation of the policy does not justify a causal inference. *Cohen v. Fred Meyer*, Inc., 686 F.2d 793, 797 (9th Cir. 1982) ("An employer who has decided upon a new policy is not guilty of unlawful retaliation simply because it proceeds with the implementation of that policy after learning that one of the employees who will be affected thereby has recently engaged in a protected activity.").[30]

With regard to the various program managers' decisions not to assign Plaintiff to their projects, Plaintiff has not adduced any evidence that could lead to a reasonable inference that, at the relevant times, the various project managers knew of either Plaintiff's 2004 DRP[31] or Plaintiff's 2011 administrative charges. (DSOF ¶¶ 128, 173, 279, 290, 333; PRSOF ¶¶ 128, 173, 279, 290, 333). Accordingly, the Court cannot reasonably infer that the program managers had knowledge and Plaintiff cannot demonstrate but-for-causation.

---

when an engineer is not currently assigned to a specific customer-funded project.

[29] Further, Plaintiff does not dispute that as early as August 2010, she knew the importance of being on a customer-funded program because she "understood that charging overhead was becoming a bigger concern." (DSOF ¶¶ 114–15; PRSOF ¶¶ 114–15).

[30] Moreover, Plaintiff's February 2011 administrative charges cannot provide the requisite causal link because they occurred *after* O'Dea rated Plaintiff "Needs Improvement."

[31] Citing to Mr. Monteilh's deposition, Plaintiff alleges that Mr. Monteilh knew of Plaintiff's 2004 DRP complaint because "he was interviewed as part of the investigation and submitted a written statement." (PRSOF ¶ 291). However, Mr. Monteilh's deposition testimony clearly explains that HR "did not tell" him why HR requested a written statement. (Sept. 13, 2013 Dep. of Micahel A. Monteilh, Doc. 88-1, Ex. 3 at 26:4–25). Plaintiff proffers no evidence contradicting Mr. Monteilh's deposition testimony.

With regard to Plaintiff's termination by O'Dea as part of the June 2011 RIF, Plaintiff has shown that O'Dea had knowledge of both complaints and, arguably, temporal proximity.[32]

> Under the pre-*Nassar* "motivating factor" test, evidence of knowledge and proximity in time, together, could have been sufficient for the Court to find a disputed issue of fact on causation. *Yartzoff*, 809 F.2d at 1376 (citing *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731–32 (9th Cir. 1986)); *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) (a causal link may be inferred from proximity in time). Post-*Nassar*, however, Plaintiff must meet the "more demanding" burden of showing but-for causation. *Nassar*, 133 S.Ct. at 2534.

*Drottz*, 2013 WL 6157858, at *15. While knowledge and temporal proximity certainly remain relevant when inferring but-for causation, in this case they cannot be enough to satisfy Plaintiff's prima facie burden. Here, Plaintiff has offered no other evidence supporting but-for-causation despite the undisputed fact that all 28 of O'Dea's other engineers without a current assignment were also selected for the RIF despite not participating in any protected activity. Moreover, Plaintiff does not dispute that O'Dea continued attempting to find Plaintiff a project assignment in the months between Plaintiff's February 2011 administrative complaint and the June 2011 RIF. (DSOF ¶¶ 214–21; PRSOF ¶¶ 214–21) and that Plaintiff, herself, "determined that the open IOS requisitions were 'not a fit' for her" (DSOF ¶ 219; PRSOF ¶ 219). Alleged retaliatory motives notwithstanding, Plaintiff even admits that O'Dea, himself, assigned her to a MUOS project in March 2011. (PRSOF ¶¶ 518–24). Thus, Plaintiff has not set forth sufficient evidence on which to establish a genuine dispute of material fact on but-for causation, an element of a prima facie Title VII retaliation claim.

Because Plaintiff has failed to meet her prima facie burden, the Court does not continue the *McDonnell Douglas* burden-shifting analysis. Accordingly, the Court grants

---

[32] The four month period between the February 2011 administrative complaints and the June 2011 lay-off may be too long to demonstrate temporal proximity. However, the Court need not decide this because a finding of temporal proximity would not affect the Court's ultimate decision that Plaintiff fails to meet her prima facie but-for-causation burden.

1  GDC4S's motion for summary judgment with respect to Count Three, Title VII

2  Retaliation.[33]

### 4.    Count Four: Sexual and Racial Harassment

4  Plaintiff's fourth cause of action purportedly alleges that GDC4S subjected her to

5  a race and sex-based workplace harassment. (Doc. 68 ¶¶ 89–97). Title VII's general

6  prohibition against discrimination extends to harassment claims. *See, e.g.*, *Faragher*, 524

7  U.S. at 786; *Manatt v. Bank of America*, 339 F.3d 792, 798 (9th Cir. 2003); *Fuller v. City*

8  *of Oakland, Cal.*, 47 F.3d 1522, 1527 (9th Cir. 1995). GDC4S argues that Plaintiff's FAC

9  "fails to plead *any* of the elements of a harassment claim; in fact, the Complaint does not

10  even allege which of her various protected classifications is or are supposed to be the

11  basis for her claim."[34] (Doc. 93 at 21 (citing FAC, Doc. 68 at 89–97)). Nonetheless,

12  GDC4S's motion articulates (Doc. 93 at 21–22) undisputed facts that demonstrate, at

13  worst, a single 2005 racist comment made by Plaintiff's subordinate (DSOF ¶¶ 38–39),

14  two isolated arguably sexists comments made in 2003 and 2004 (one made by a manager

15  and another by other engineers) (*id.* ¶ 40), and the single email response to her April 4th

16  scheduling email that Plaintiff subjectively believes indicates some sort of ADA or

17  FMLA-based discrimination despite containing no specific mention of her disabled son

18  or FMLA-leave to care for her son (*id.* ¶ 249). Such isolated, old, and content neutral

19  statements do not provide adequate basis for a harassment claim. *Manatt v. Bank of AM.*,

20  339 F.3d 792, 789–99 (9th Cir. 2003) (isolated comments); *Nat'l R.R. Passenger Corp. v.*

21  *Morgan*, 536 U.S. 101, 117 (2002) (old comments); *Al-Raheem v. Care*, No. 1:10-CV-

22  2064 AWI GSA, 2012 WL 2116530, at *4 (E.D. Cal. June 11, 2012) (content-neutral

23  comments). Furthermore, Plaintiff's Response (Doc. 95) fails to contest GDC4S's

---

25  [33] The Court notes that to the extent that Plaintiff's arguments also imply that
26  Count Three includes retaliation based on whether or not her protected actions included
   complaints of disability discrimination, the but-for-causation analysis of Title VII
27  retaliation similarly results in granting GDC4S's motion for summary judgment.

28  [34] Plaintiff's FAC merely alleges that GDC4S "subjected [her] to a pattern of
   pervasive discriminatory treatments by barring her to work positions that she was
   qualified to work, which were afforded to similarly situated employees." (Doc. 68 ¶ 93).

arguments or otherwise argue that a genuine dispute of material fact exists with regard to Count Four. (*See* PRSOF ¶¶ 38–40, 249). Therefore, the Court finds no genuine dispute of material fact that Plaintiff was subjected to racial or sexual (or ADA or FMLA-based) harassment. Accordingly, the Court grants GDC4S's motion for summary judgment with respect to Count Four.

### 5.      Count Five: Wrongful Termination

Plaintiff's fifth cause of action appears to allege that GDC4S wrongfully terminated her employment in violation of the Civil Rights Act of 1964 and the Arizona Civil Rights Act, A.R.S. § 41-1463, *et seq*. (Doc. 68 at ¶¶ 98–102). However, as GDC4S notes (Doc. 93 at 22), Plaintiff has previously admitted that she "does not contest that there is no independent claim for "wrongful discharge" (Plaintiff's Response to Defendants Motion for Judgment on the Pleadings (Doc. 37), Doc. 41 at 14–15). Furthermore, Plaintiff's Response (Doc. 95) again fails to contest that Count Five, retitled as "Wrongful Termination," is not an independent claim. Accordingly, the Court grants GDC4S's motion and dismisses Count Five, "Wrongful Termination."

### 6.      Count Six: Disability Discrimination

Similarly to Counts One and Two, Plaintiff's sixth cause of action alleges that GDC4S violated Title I of the ADA, 42 U.S.C. §§ 12111 *et seq.*, by treating Plaintiff inconsistently from GDC4S's employees who were not associated with an autistic child. (Doc. 68 ¶¶ 103–11). Section 12112 makes "disparate treatment" based on disability a violation of federal law. 42 U.S.C. § 12112.

#### a.      Legal Framework for ADA Discrimination

Title I of the ADA prohibits employment discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a); *Lopez v. Pac. Mar. Ass'n*, 657 F.3d 762, 764 (9th Cir. 2011) ("[t]he ADA prohibits employment decisions made because of a person's qualifying disability"). To state a prima facie claim under the ADA, Plaintiff must demonstrate: (1) that she is a "qualified individual" within the meaning of the ADA; (2) that she can perform the essential functions of her job; and, (3) that she

suffered an adverse employment action because of[35] the disability. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *see also*, *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999). Because Plaintiff has produced no direct evidence of disability discrimination, the Court will apply the *McDonnell Douglas* burden shifting framework. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas*, 411 U.S. at 802.

### b.   Prima Facie Case

Initially, the Court notes that both Parties comingle their Title VII disparate treatment arguments with those of ADA disparate treatment. (*See* Doc. 93 at 9–18; Doc. 95 at 9–14; Doc. 102 at 1–5). However, where in her Response Plaintiff points to evidence, makes arguments, and cites to authority specific to Title VII disparate treatment, Plaintiff nearly completely ignores her ADA disparate treatment claim. (Doc. 95 at 9–14). Upon scrutinization, Plaintiff's Response offers only two trivial acknowledgements of Plaintiff's ADA claim: alleging in her facts that none of the 72 SGSS-assigned engineers "were disabled or associated with a disabled person" (*id.* at 9); and stating that she is a member of a protected class because she "has a disabled son" (*id.*).[36]

Turning attention upon the elements of a prima facie ADA disparate treatment claim, it quickly becomes apparent that Plaintiff's decision not to elaborate on her ADA claim was likely occasioned by its utter lack of merit. Although Plaintiff clearly meets the first two elements,[37] she does not even attempt to articulate a causal link between an

---

[35] Here, "because of" is read to require "but for" rather than "proximate" causation. *See UMG Recordings, Inc. v. Shalter Capital Partners LLC*, 718 F.3d 1006, 1017 n.7 (9th Cir. 2013) (citing *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 301 n.4 (3d Cir. 2007), for the proposition that "[T]he ADA prohibits discrimination against an individual '*by reason* of such disability.' . . . [T]his language . . . clearly establishes that the . . . ADA . . . requires only but for causation.").

[36] Plaintiff's oral argument was similarly bereft of any meaningful ADA-based argument.

[37] This assumes that Plaintiff's association with a disabled (autistic) child is a qualifying disability under the ADA; Plaintiff has not cited to any authority establishing this assumption, but GDC4S has not contested it.

adverse employment action and her association with a disabled son. Rather than demonstrating any sort of causal link, the undisputed evidence proves that at the relevant times nearly all of the various GDC4S employees related to Plaintiff's numerous alleged adverse employment actions had no knowledge of Plaintiff's disabled son. (DSOF ¶¶ 128, 173, 266–68; PRSOF ¶¶ 128, 173, 266–68 (not disputing same)). Of the rare exceptions, such as Strozier (who learned in 2004 when Plaintiff was soliciting donations for an autism-related organization), Plaintiff offers no evidence linking their knowledge to an adverse employment action.[38] Because Plaintiff has not demonstrated a genuine dispute of material fact that the various decision makers had knowledge of her association with her disabled son, Plaintiff fails to demonstrate a prima facie case. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n.7 ("If [the employer] were truly unaware that . . . a disability existed, it would be impossible for her hiring decision to have been based, even in part, on [the employee's] disability. And, if no part of the hiring decision turned on [the employee's] status as disabled, he cannot, *ipso facto*, have been subject to disparate treatment.").

Lastly, to the extent that Plaintiff attempts to use her FMLA retaliation claim to imply causation in her prima facie ADA disparate treatment claim, Plaintiff's attempt conflates the two causation burdens. The ADA prohibits employment decisions made because of a person's qualifying disability, not decisions made because of factors merely related to a person's disability. *Lopez v. Pac. Mar. Ass'n*, 657 F.3d 762, 764 (9th Cir. 2011). Although Plaintiff's FMLA leave is related to her son's disability, animus towards Plaintiff's use of FMLA leave does not directly imply animus towards her son's disability, itself. Therefore, success on Plaintiff's FMLA retaliation claim demonstrates only that she was terminated because of her use of FMLA leave, not because of her son's disability.

In sum, the Court finds that Plaintiff has not introduced evidence sufficient to raise

---

[38] Plaintiff offers no evidence contradicting Strozier's statement that, to his knowledge, Plaintiff's son's disability never affected any employment decision at GDC4S (Weeks Decl., Doc. 98 at 2–5).

1   a genuine issue of material fact that she suffered an adverse employment action because

2   of her association with a disabled son. Thus, Plaintiff has failed to demonstrate a prima

3   facie case of disparate treatment disability discrimination under the ADA. Accordingly,

4   the Court grants GDC4S's motion for summary judgment with respect to Count Six,

5   ADA Disability Discrimination.

6                      **7.      Count Seven: FMLA Retaliation**

7          Plaintiff's seventh cause of action alleges that, in violation of the FMLA,

8   29 U.S.C. §§ 2615, *et seq.*, GDC4S terminated her employment in retaliation for

9   Plaintiff's use of FMLA time on Fridays to care for her autistic son. (Doc. 68 ¶¶ 112–24).

10  The FMLA states that it is "unlawful for any employer to interfere with, restrain, or deny

11  the exercise of or the attempt to exercise any right provided." 29 U.S.C. § 2615(a)(1).

12                           **a.      Legal Standard**

13         The Ninth Circuit has held that adverse employment actions taken against

14  employees for exercising rights under the FMLA should not be construed as retaliation or

15  discrimination, but rather as interference with rights guaranteed by the statute. *See*

16  *Bachelder v. America West Airlines*, 259 F.3d 1112, 1124 (9th Cir. 2001) (holding that to

17  prevail on a claim under § 2615(a)(1), a plaintiff "need only prove by a preponderance of

18  the evidence that her taking of FMLA-protected leave constituted a negative factor in the

19  decision to terminate her"); *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135,

20  146-47 (3rd Cir. 2004) (applying the *Bachelder* approach).

21                  The appropriate legal framework for analyzing
    Plaintiff's claims, therefore, is not the *McDonnell Douglas*
22  burden-shifting framework for employment discrimination
    and retaliation claims, but a simpler standard derived from the
23  applicable statute and regulation. *Bachelder*, 259 F.3d. at
    1124–25 (construing § 2615(a)(1) and its implementing
24  regulation). Plaintiff need only establish by a preponderance
    of the evidence that (1) he took FMLA-protected leave, (2) he
25  suffered an adverse employment action, and (3) the adverse
    action was causally related to his FMLA leave. *See*
26  *Conoshenti*, 364 F.3d at 146–47.

27  *Foraker v. Apollo Grp., Inc.*, 427 F. Supp. 2d 936, 940–41 (D. Ariz. 2006).

28

b.      Analysis

Here, the Parties agree that Plaintiff meets the first two elements of an FMLA retaliation case. In 2011, Plaintiff regularly took FMLA-protected leave approximately every other Friday. (*See, e.g.*, DSOF ¶¶ 262–63; PRSOF ¶¶ 262–63). Additionally, it is undisputed that Plaintiff suffered an adverse employment action: termination in the June 2011 RIF. With regard to the third element, causation, "Plaintiff must show that the alleged adverse employment actions were causally related to [her] FMLA leave." *Foraker*, 427 F. Supp. 2d at 942. Here, Plaintiff presents direct evidence of causation: O'Dea's email response to Plaintiff's April 4, 2011 email.

It is undisputed that shortly after Plaintiff began working on the MUOS project, she received emails one weekend with task requests. (DSOF ¶ 249; PRSOF ¶ 249). In response, Plaintiff sent an email to Hobson and other MUOS managers on April 4, 2011 stating: "I do not work on Saturday and Sunday. On Friday's [sic] I work intermittent[ly] as needed." (*Id.*). The MUOS managers expressed dissatisfaction with Plaintiff's email and forwarded it to O'Dea. (DSOF ¶¶ 253–54; PRSOF ¶¶ 253–54). In particular, Hobson expressed an expectation that Plaintiff would be available for work on Fridays. (PRSOF ¶ 533). On April 5, 2011, O'Dea emailed HR seeking approval of a draft email response to Plaintiff. (*Id.* ¶ 538). The draft email states:

> As an exempt employee you cannot define your job to be a specific number of hours per week, nor the days you will work. Anyone supporting a program must be flexible and willing to work what is asked. . . . It concerns me when I've worked so hard to find you a position on a paying program, and you tell them as an exempt employee you'll only work the schedule you've defined. *This has caused them to question your role on MUOS, and certainly your commitment to making the program a success.*

(*Id.* (emphasis added)). Plaintiff argues that "this" in the email refers to her use of FMLA leave on intermittent Fridays, and, therefore constitutes direct evidence of causation.

GDC4S disputes Plaintiff's interpretation of "this" and argues that "this" refers to an "insolent tone" in Plaintiff's April 4 email. (Doc. 93 at 18 (citing DSOF ¶¶ 253–54)). Although GDC4S points to substantial evidence suggesting that GDC4S's interpretation

of "this" is correct (*see* Doc. 102 at 9–11 (citing numerous paragraphs of the DSOF)), the evidence merely demonstrates that there is, indeed, a genuine dispute of material fact about the meaning of "this."[39] Critically, at the summary judgment stage, all reasonable inferences must be made in favor of the non-movant. Because the Court does not find it unreasonable to interpret "this" as a reference to Plaintiff's Friday FMLA-protected leave, the Court finds a genuine dispute of material fact on causation. *See Godwin*, 150 F.3d at 1221 ("When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial."). Thus, Plaintiff has met her summary judgment burden on all three elements of her FMLA retaliation claim. Accordingly, the Court denies GDC4S's motion for summary judgment with respect to Count Seven, FMLA Retaliation.

## IV.    CONCLUSION

Accordingly,

**IT IS ORDERED** that consistent with the above, Plaintiff Loretta Cheek's Motion for Partial Summary Judgment (Doc. 85) is DENIED.

**IT IS FURTHER ORDERED** that consistent with the above, Defendants General Dynamics Corporation and General Dynamics C4 Systems Incorporated's Motion for Summary Judgment (Doc. 93) is GRANTED in part and DENIED in part.

With respect to Defendant General Dynamics Corporation, summary judgment is granted on Counts Two, Three, and Seven.

With respect to Defendant General Dynamics C4 Systems Incorporated, summary judgment is granted on Counts One, Two, Three, Four, Five, Six, and the Counterclaim. Summary judgment is denied on Count Seven.

---

[39] For example, although Hobson may not have known that Plaintiff did not work certain Fridays because of FMLA leave, Hobson did immediately inquire of O'Dea whether Plaintiff had some sort of arrangement not to work on Fridays. (DSOF ¶ 279; PRSOF ¶¶ 279, 531–32). O'Dea may not have told Hobson the true FMLA-based reason, however, shortly thereafter O'Dea did request that Hobson document any performance issues of Plaintiff. (PRSOF ¶ 547). Then, on May 30, Hobson firmly requested O'Dea remove Plaintiff from the MUOS project and O'Dea selected Plaintiff for the June 2011 reduction in force. (DSOF ¶¶ 277, 281, 283).

1      **IT IS FURTHER ORDERED** that the Parties are directed to confer in good faith

2  to resolve any disputes concerning the amount of reasonable attorneys' fees and costs

3  related to GDC4S's Counterclaim for Breach of Contract. *See* L.R. Civ. 54.2(d)(1). If the

4  Parties are unable to agree, GDC4S may file a motion pursuant to Local Rule 54.2. Any

5  such motion shall be filed, with a supporting memorandum, on or before June 27, 2014,

6  with the response and reply briefs due in accordance with the time periods provided in

7  Local Rule 54.2(b)(3) and (4).

8      **IT IS FURTHER ORDERED** that Defendant General Dynamics shall be

9  dismissed with prejudice.

10      Dated this 19th day of May, 2014.

_____

James A. Teilborg
Senior United States District Judge